UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | : | CRIMINAL NO.  15-063 (CKK) |
| | : | |
| v. | : | |
| | : | Sentencing Date: April 13, 2016 |
| **DOUGLAS HUGHES,** | : | |
| Defendant. | : | |

**GOVERNMENT'S REPLY BRIEF IN SUPPORT OF ITS
MEMORANDUM IN AID OF SENTENCING**

The United States of America respectfully submits this Reply Brief in support of its Memorandum in Aid of Sentencing (Doc. 42), and urges the Court to impose a sentence of ten months of incarceration followed by one year of supervised release.

**I.    INTRODUCTION**

Defendant Douglas Hughes referred to his illegal gyrocopter flight on April 15, 2015, as a "stunt," and in his written request that he serve no jail time, he now describes his conduct as "a daring flight – an astonishing act of aerial civil disobedience." See Defendant's Memorandum in Aid of Sentencing (Doc. 44 at 30).  But this was not a circus act performed by trained professionals in a controlled setting, nor was it an act of non-violent civil disobedience.  Instead, the defendant's gyrocopter flight put unsuspecting people in real danger, disrupted operations at the United States Capitol, and demonstrated a profound disrespect for the law and the legitimate rights of others.

Defendant Hughes committed his crimes because he craved attention.  He does not claim that any of the laws he broke are unjust on their face or in practice, nor does he question the wisdom of the laws that protect public safety in the sky and that safeguard the United States Capital Region by forbidding unlicensed and reckless aircraft flight.   Instead, he deliberately

1

violated important public safety laws because he wanted people to pay attention to his political views. Incarceration is the appropriate punishment under these circumstances.

## II.   ARGUMENT

In asking the Court to impose no jail time for his crimes (aside from the date of his arrest), defendant Hughes understates the danger to which he willfully subjected the public, misstates the actual harm to the community, and dramatically overstates the purpose and consequences of his actions by comparing himself to Dr. Martin Luther King, Jr., and Rosa Parks. The defendant's arguments should be rejected for the reasons that follow, and for the reasons set forth in the United States' Memorandum in Aid of Sentencing (Doc. 42).

### A.   Nature and Circumstances of the Offense

Defendant Hughes mistakenly argues that his conduct imposed no harm on the community and that he gained no personal benefit or created any societal risk or harm (Doc. 44 at 3). He also suggests – inaccurately – that his criminal conduct is mitigated because he viewed himself as a nonviolent political protester practicing legitimate civil disobedience. Id. at 13-14.

First, defendant Hughes did, in fact, personally benefit from his flight. The defendant has received significant and sustained attention in the media, and has worked to use his violation of law to bring attention and volume to his particular political belief. In this way he was able to gain something tangible that he was unable to do through lawful means: namely, have his political opinion and viewpoint promoted on national television and radio for free. This was the defendant's intent from the beginning, and it explains why he sought public relations coaching, contacted a reporter, and filmed a media documentary in the months before his takeoff, rather

2

than alert the authorities of his dangerous intentions (Doc. 42 at 18).[1]  In his sentencing memorandum, the defendant actually revels in his notoriety, and states that "he should be considered a hero for his conduct." (Doc. 44 at 14).  Indeed, it may be a troubling sign of our age if some believe that dangerous violations of legitimate public safety laws for political theater and free media attention should constitute heroism.

Second, as was discussed in the government's sentencing memorandum, defendant Hughes' conduct was far from harmless: he inflicted real harm and placed the public at serious risk of destruction and damage.  The U.S. Capitol complex was placed on lockdown after his landing, freezing in place Congressional Members and staff, visitors to the Capitol, tourists, and a foreign delegation including the Prime Minister of Iraq and his staff.  The lockdown affected streets surrounding the Capitol grounds, resulting in significant traffic delays.  Law enforcement resources were diverted from their legitimate and important responsibilities to investigating whether the gyrocopter posed any danger to the public.  Defendant Hughes knew that his flight plan would present significant safety risks (see Doc. 42 at 8, 14-15), but he nonetheless chose to subject the public to those risks in order that his voice be heard on a grand scale.  Such a calculation reflects an extreme disregard of the public safety rights of others.

Defendant Hughes, and those of us residing in the capital region, are all fortunate that the flight did not cause actual human injury or property damage, but there was extreme risk that it

---

[1] The defendant's claim to have alerted the authorities two hours in advance of his flight is completely inaccurate.  He did not notify any government agency or official prior to his flight; the only notice he provided to anyone an arguably government related entity was a time-delayed email that was sent to the barakobama.com website, which itself is not a government website.  The email was not sent until well after the defendant had taken-off, and was not discovered until after he landed.  Further, the defendant did not call law enforcement from his cell phone, or even carry a radio with him on the gyrocopter to communicate with law enforcement.  The one media outlet with knowledge of the flight, upon agreement with the defendant, also did not provide any advance notice to law enforcement before the flight, nor could it have confirmed what was actually being carried on the flight (as they were not present at the takeoff location).

could have occurred: (1) the defendant did not properly train for the flight and never obtained an airman certificate; (2) the gyrocopter was untested and not equipped with essential safety devices that could help prevent an air collision, including an altimeter, a transponder beacon, or a two-way radio that would allow the pilot to communicate with other aircraft and air traffic control; (3) the defendant suffered from medical conditions that could interfere with his ability to safely pilot the gyrocopter, and suffered from vision problems and hearing loss; (4) the defendant did not provide any real prior notice of the flight to aviation authorities or law enforcement; (5) the defendant's flight path took him within miles of 20 different airports and airfields, including Ronald Reagan Washington National Airport just three miles from downtown D.C; and (6) the gyrocopter flew in close proximity to several other aircraft operating at different altitudes during the flight, including a dangerously close encounter where it flew within around 1,400 yards of a commercial flight departing from Reagan Airport, a distance that the jet could cover in 20 seconds (Doc. 42 at 22-23 and n. 17).[2]

Even now, the defendant seems oblivious to, and in outright denial of, the risk he caused to the Delta flight and other aircraft (and people) during his flight.[3] Post-flight analysis of the

---

[2] Delta Flight 1639 on the day in question was a MD-88, not an Airbus as original stated in the government's memorandum. An MD-88 carries 149 passengers, has a wingspan of approximately 108 feet, a length of 147 feet, and a height of 30 feet. See Delta Airlines, Delta McDonnell Douglas MD-88, at http://www.delta.com/content/www/en_US/traveling-with-us/airports-and-aircraft/Aircraft/mcdonnell-douglas-md-88.html. Given the size of the aircraft, and the fact that the transponder is located in the cockpit, the gyrocopter and the Delta Flight were almost certainly closer than calculated (which assumes the two planes took up minimal space in the sky). Additionally, given the transponder location in the cockpit, and the takeoff angle from National Airport, the altitude reported by the transponder does not show where the altitude of the rear of the aircraft is in the air (given its length of almost 150 feet).

[3] Defendant Hughes reportedly denied flying in close proximity to a commercial aircraft in an e-mail sent to media sources after the United States filed its Memorandum in Aid of Sentencing, and he described this as a "fabrication" invented by a "prosecution that is either intentionally deceptive or grossly negligent in [its] presentation of the evidence." Alanna Durkin Richer,

radar feed by the Federal Aviation Administration ("FAA") reveals the gyrocopter's flight and close encounters with several other aircraft inside the DC SFRA. See Exhibits 1 and 2.[4] The radar feed shows, among other things, the defendant flying over an active airport (Davis Airport, also known as the W50 area), and in very close proximity to Montgomery County Airpark (GAI airport) while three different planes were taking off and landing from the airport. See Exhibit 2 at pp. 4-10 (still images from radar video showing gyrocopter flying near Davis Airport and GAI, with aircraft taking off and landing from GAI).[5] As the Court may be aware, the Montgomery County Airpark is a heavily-used airport, which is often utilized by novice pilots for training at lower altitudes; these pilots often execute "touch and go" landings as part of their hands-on training. See generally, Victoria St. Martin, Gaithersburg Residents Push for Safety Changes at Montgomery Airpark, Washington Post, November 5, 2015. The radar feed also confirms what the government provided to the Court in its prior filing: that the defendant flew dangerously close to Delta Flight 1639. See Exhibits 2 at pp. 16-21 (shows image of Delta flight

---

"Prosecutors: Gyrocopter pilot nearly collided with airplane," Washington Post, March 5, 2016. He reportedly told a reporter that "I was there, it didn't happen. They said I flew within 1500 yards. I wasn't within 30 miles of [a commercial flight taking off from Reagan airport]." Spencer S. Hsu, "Gyrocopter pilot rebuts U.S. claim that Capitol flight risked midair collision," Washington Post, March 6, 2016.

[4] Exhibit 1 is a video (shown at 20x speed to shorten the playing time) of the post-flight FAA analysis of the unfiltered radar imagery, which shows select parts of the heads-up radar display of the DC area and the gyrocopter appearing on radar (initially connoted with a red arrow in the opening screen) as it crosses into the DC SFRA. The green dot being followed in the video through the DC SFRA is the gyrocopter, and it shows other aircraft (larger green dots with), and some airports and restricted zones (in white). This material is subject to the Protective Order issued by the Court, and has been filed under seal. Exhibit 2 contains still photos taken from this video and are also subject to the Protective Order, and are filed under seal. The FAA has reviewed Exhibit 4, which contains selected images from Exhibits 2 (pp. 2, 5, 6, 10, 15, 20 and 21) and 3 (page 2), and has permitted public disclosure of these select images. As such they are being filed on the public docket.

[5] Exhibit 2 also shows an aircraft flying almost directly overtop the gyrocopter, see pp. 2-3, and other planes that it flew near while inside the DC SFRA, see pp. 11-15.

on p. 16 starts as a "*" and shows altitude of 400 feet and then turns to a "Y" on pp. 17-21, and shows locations of the aircraft from 400 feet to 1600 feet, just as green dot gyrocopter passes into the P-56 white rectangular zone) and 3.[6]  Importantly, the defendant was in violation of the FAA flight separation rules (1.5 nautical miles or at least 500 feet vertical separation) just after the Delta flight took off from National Airport, as it rose from take-off to 1700 feet and sped over 180 knots an hour directly toward the defendant's incoming gyrocopter.  In total, assuming the defendant was at approximately 1200 feet altitude (which is based on defendant's post-arrest claim that he was in excess of 1,000 feet for almost the entire flight), the defendant would have been in violation of the flight buffer zone surrounding the Delta flight for approximately 20 seconds during perhaps the most dangerous part of air travel, the take-off.[7]  Notably, the defendant would have been in violation of the flight separation rules even if he had been at a much lower altitude because the Delta flight was in its climb after takeoff, and the defendant was within 1.5 nautical miles from the Delta flight for some time.  These flight separation rules exist to avoid collisions and danger to flight traffic, and are not simply advisory.  The risk to the Delta Flight, and National Airport generally, was heighted because of the unique challenges and difficulties in taking off and landing from that airport.  See, e.g., Ashley Halsey III, "At National Airport Aborted Landings Are Not Uncommon," Washington Post, March 30, 2011 (documenting congested flight plans and unplanned aborted landings at the airport); John Cox, "Ask the Captain: Is it Hard to Land at Reagan National Airport?," USA Today, June 10, 2013, located at http://www.usatoday.com/story/travel/columnist/cox/2013/06/10/ask-the-captain-is-it-

---

[6] Exhibit 3 is a slightly different view of the radar feed, which shows the flight number of Delta Flight 1639, and shows the gyrocopter as a small green/blue dot almost on top of, to the left side of, the letter D in "Delta" just as both aircraft are near the P-56 restricted zone within the DC SFRA. Part of this document is subject to the Protective Order issued by the Court, and has been filed under seal.

[7] The gyrocopter was not equipped with an altimeter.

hard-to-land-at-reagan-national-airport/2402521 (describing issues with landing protocols and River Route approach). The government stands ready to call an FAA expert witness at sentencing to establish the facts outlined herein.

The late Senator Daniel Patrick Moynihan was often quoted as saying that everyone is entitled to their own opinions, but they are not entitled to their own facts. The defendant's inability – or refusal – to acknowledge the fact that he recklessly endangered multiple people and flew near other aircraft bears on his appropriate punishment. A criminal who truly recognizes harms caused and averted – and honestly vows to avoid such conduct in the future – will be less likely to engage in similar reckless conduct in the future. A defendant who denies such truths is deceiving himself, avoids the full measure of responsibility for his crimes, and has the potential for repeating dangerous acts in the future.

Third, the gyrocopter flight was not a non-violent act of civil disobedience or a selfless gift to the public, as the defendant states in his sentencing memorandum (Doc. 44 at 3) ("Rather than acting selfishly, Mr. Hughes' conduct was an altruistic act that was done in order to advance the interest of the vast majority of people residing in the United States"). The defendant's willingness to place unsuspecting people at significant jeopardy in an effort to draw attention to his pet political cause separates him from the conduct of the principled, non-violent civil rights heroes such as Dr. Martin Luther King, Jr., and Rosa Parks (Doc. 44 at 11-14). To be nonviolent, one's conduct must not harm anyone. See Martin Luther King, Jr., "Gandhi Memorial Lecture," published in January 1964 Howard University Magazine, and republished in Black World, March 1964 (explaining that for nonviolence "[o]ne's aim must never be to inflict injury"); Mahatma K. Gandhi, edited by Dennis Dalton, Gandhi: Selected Political Writings, 41 (1996) ("When a person claims to be non-violent, he is expected not to be angry with anyone

who has injured him. He will not wish him harm; he will wish him well; he will not swear at him; he will not cause him any physical hurt. . . . Thus non-violence is complete innocence.") As a result, the defendant's effort to equate his reckless and dangerous crimes with nonviolent successes of our nation's civil rights legends is sadly mistaken. Dr. King, whose own Memorial on the National Mall was violated when it was overflown by the defendant during his flight, famously wrote:

> One may well ask: "How can you advocate breaking some laws and obeying others?" The answer lies in the fact that there are two types of laws: just and unjust. I would be the first to advocate obeying just laws. One has not only a legal but moral responsibility to obey just laws. Conversely, one has a moral responsibility to disobey unjust laws. . . . Sometimes a law is just on its face and unjust in its application. For example, I have been arrested on a charge of parading without a permit. Now, there is nothing wrong with an ordinance which requires a permit for a parade. But such an ordinance becomes unjust when it is used to maintain segregation and to deny citizens the First Amendment privilege of peaceful assembly and peaceful protest. … In no sense do I advocate evading or defying the law, as would the rabid segregationist. That would lead to anarchy."

Martin Luther King, Jr., "Letter from a Birmingham Jail," April 16, 1963, reprinted in Bonsignore, John, et. al, Before the Law: An Introduction to the Legal Process, at 462-463 (1994). The distinction between violating just laws and unjust laws is a key point in our nation's history of civil disobedience. As Justice Abe Fortas, the author of the important First Amendment case Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969) (upholding student's right to silently protest the Vietnam War in school), observed:

> In my judgment civil disobedience – the deliberate violation of law – is never justified in our nation, where the law being violated is not itself the focus or target of the protest. So long as our governments obey the mandate of the Constitution and assure facilities and protection for the powerful expression of individual and mass dissent, the disobedience of laws which are not themselves the target of protest – the violation of law merely as a technique of demonstration – constitutes an act of rebellion, not merely of dissent. . . . [L]aw violation directed not to the laws or practices that are the subject of dissent, but to unrelated laws which are disobeyed merely to dramatize dissent, may be morally as well as politically unacceptable.

Fortas, Abe, Concerning Dissent and Civil Disobedience (1970), reprinted in Bonsignore, John, et. al, Before the Law: An Introduction to the Legal Process, at 467 (1994).[8]  In this case, defendant Hughes does not (and cannot) claim that the laws he violated, which protect air safety and safeguard the national capital as well as the integrity of those honored on the National Mall, are unjust or immoral, or were being applied unfairly.  Nor can he claim any unfettered First Amendment right to violate restricted national defense airspace and FAA rules and regulations regarding safe flight to dramatize his political viewpoint.  The defendant's self-justification appears to have blinded him to the fact that his reckless acts imperiled the great American space open to all manner of peaceful protest and dissent – the National Mall, and he physically endangered visitors and protestors alike.

### B.   History and Characteristics of the Defendant

Defendant Hughes notes that he has "generally lived . . . [a] lawful life" (Doc. 44 at 14), but the Presentence Report reveals prior motor vehicle infractions for operating without required registration.  The defendant also has a recent prior infraction for failing to yield to a pedestrian at a crosswalk.  While these infractions are relatively minor, they do bear similarities to the crime that the defendant committed here: the use of a dangerous moving vehicle without appropriate authority, and a deliberate disregard for the safety of others in the community.

Additionally, the defendant's Memorandum in Aid of Sentencing, as well as statements prior to his flight ("I'm not taking orders from anyone until the rotors stop turning," Doc. 42 at 18), and immediately after his flight ("A bunch of stuff didn't work, but overall, the letters were delivered, message was delivered and no one was hurt," id. at 20) reveal an individual who is

---

[8] See also Ronald Dworkin, "Civil Disobedience and Nuclear Protest," in A Matter of Principle, at 105-112 (1985) (recognizing that harmful civil disobedience based purely to further political or policy change is rarely justified: "So nonpersuasive means used in policy-based disobedience seems the least likely to be justified in any working theory").

proud of his criminal behavior, who believes that the illegal conduct makes him a national hero, and who does not regret putting the safety of the public below his own self-glorification. Such characteristics counsel towards a sentence of incarceration as punishment to protect the community.

### C.    Additional Factors Pursuant to 18 U.S.C. § 3553(a)(2)

One additional point regarding the sentencing factors identified in 18 U.S.C. § 3553(a)(2) bears noting.

The recommended incarceration is appropriate because it will promote respect for the law. Defendant Hughes is unremorseful. He espouses a dangerous belief that his illegal conduct was justified and that the government "should not be seeking to deter the type of conduct in which [he] engaged" because a "free and democratic society will not seek to dissuade its citizens from engaging in dissent" (Doc. 44 at 20). Such a perspective on this criminal case distorts reality. This prosecution has nothing to do with dissuading the defendant from engaging in dissent. Indeed, the United States has been completely viewpoint-neutral in its application of the criminal law in this case. The content of defendant Hughes' political beliefs – whether dissent or agreement with the government - is irrelevant to the dangerousness of his conduct. He stands before the Court to face sentencing not because of any political viewpoint, but solely because he willfully and recklessly violated important public safety laws that protect safe movement in the skies and the security of the United States Capital Region. If the defendant's conduct is truly "heroic" as he claims, we all should be prepared for more oncoming reckless "heroes" in aircraft who will likely be far less lucky. A sentence of ten months of incarceration is necessary under these circumstances to promote respect for the law, to protect the community, and to deter others from engaging in similarly reckless and dangerous conduct.

For these reasons, as well as the reasons set forth in the United States' Memorandum in Aid of Sentencing (Doc. 42) and the information reflected in the Presentence Report, the United States respectfully requests that the defendant be sentenced to a period of ten months incarceration, followed by a period of one year of supervised release with the special conditions requested by the United States.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

By: _____/S/_____
TEJPAL S. CHAWLA
    D.C. Bar No. 464012
MICHAEL J. FRIEDMAN
    N.Y. Bar No. 4297461
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20503
(202) 252-7280 (Chawla)
(202) 252-6765 (Friedman)